[S. F. No. 5399.   Department One.—April 4, 1910.]

In the Matter of the Estate of HENRY S. GIRD, Deceased. RICHARD GIRD et al., Appellants, v. WILLIAM STEPHEN BENNETT and NELLIE FLORENCE BENNETT, Respondents.

ESTATES OF DECEASED PERSONS—RIGHT OF SUCCESSION—LEGITIMATION OF ILLEGITIMATE CHILDREN—QUESTION OF SUPPORT OF FINDINGS.— Where the right of succession to the estate of a deceased person depends upon the legitimation of illegitimate children of the deceased, under section 230 of the Civil Code, and an advisory verdict was found upon questions submitted, that deceased was the father of each child, that he publicly acknowledged each during its minority as his own child, that he received each into his family as his own child, and that he otherwise treated each during its minority as if it were his legitimate child, and the trial court adopted these findings as its own, such findings are sufficient to establish the right of succession; and the main question first to be considered is the assigned insufficiency of the evidence to support them.

ID.—EXISTENCE OF FAMILY ESSENTIAL.—It is settled that the existence of a family into which the children can be received is essential to the adoption of illegitimate children by their father as legitimate under section 230 of the Civil Code.

ID.—SUFFICIENCY OF EVIDENCE AS TO "PATERNITY" — MARRIAGE OF MOTHER—NAMES OF ILLEGITIMATE CHILDREN—NON-ACCESS OF HUS-BAND.—Although it appears that the illegitimate son and daughter bore the married name of their mother, whose husband had left her one year after their marriage, yet where the evidence clearly shows that the husband never again had access to her, that she resided thereafter in the home of the deceased until his death, that four years after the separation the son was born and the daughter ten years thereafter, and the mother testified positively that the deceased was the father of both children, that she commenced sexual relations with the deceased one year before the birth of the son, that the deceased sent and paid for the physician who attended at the birth of each, and her testimony was corroborated by other proved admissions of his paternity, and of the manner in which they continued to live together,—the evidence warrants the conclusion of the trial court that the mother's husband was not the father of either and that deceased was the father of both.

ID.—ATTEMPT TO IMPEACH MOTHER AS A WITNESS—INCONSISTENT DEC-LARATIONS AND CONDUCT—CREDIBILITY FOR TRIAL COURT.—Where evidence was offered to impeach the mother of the children as a wit-ness, by declarations and conduct inconsistent with her evidence, the question of her credibility as a witness was for the trial court to determine.

ID.—RULE OF DECISION UPON APPEAL NOT ALTERED.—No different rule of decision in this court can be applied in determining the sufficiency of the evidence to sustain the finding in a case of this character than in any other case.

ID.—DIRECT EVIDENCE OF ONE WITNESS SUFFICIENT TO SUSTAIN VERDICT OR FINDING.—The direct evidence of one witness, who is believed by the jury and the trial court to be entitled to full credit, is sufficient proof of any fact except perjury or treason; and when the trial court, being the exclusive judge of the credibility of the mother of the children as a witness, approved the advisory verdict of the jury, and concluded that she was a witness entitled to full credit, the conclusion on that question is not open to review in this court.

ID.—SUFFICIENCY OF EVIDENCE OF "TREATMENT OF CHILDREN AS LEGITIMATE."—The criterion of the statute as to the treatment of the illegitimate children as legitimate is the treatment usually accorded to legitimate children; and, under this criterion, it is held not open to serious question that the evidence is sufficient to support the conclusion of the trial court that the deceased treated both the son and the daughter as if they were his legitimate children.

ID.—SUFFICIENCY OF EVIDENCE OF "PUBLIC ACKNOWLEDGMENT"—MEANING OF STATUTE—ORDINARY SENSE OF WORDS.—The requirement of the statute, that the father shall "publicly acknowledge" the illegitimate child "as his own," only imports a "public acknowledgment" in the ordinary sense of the words used, and only imports a holding out of the facts without concealment to the knowledge of third persons. The circumstances surrounding the birth of the children, and the conditions existing in the household of deceased before and after their birth, coupled with his treatment of them and interest in them, were of such a nature, and with evidence of his declarations to third persons that they were his children, without any statement to the contrary, was evidence sufficient to sustain the finding that he "publicly acknowledged" them "as his own."

ID.—ABSENCE OF "PUBLIC ACKNOWLEDGMENT" TO OTHER PERSONS—INTRODUCTION OF SON BY MOTHER'S MARRIED NAME—CONFLICT.—The absence of "public acknowledgment" of paternity to a large number of other persons met by the father, to whom he owed no acknowledgment, and that in certain instances he introduced his son by his mother's married name, which they continually bore, does not destroy the effect of the evidence, which shows a "public acknowledgment of both the son and daughter as his children, sufficient to sustain the findings of the court, even if the other evidence introduced tended to create a conflict.

ID.—SUFFICIENCY OF EVIDENCE AS TO "RECEIVING CHILDREN INTO HIS FAMILY"—IMPORT OF TERMS.—It is held that the evidence is clearly sufficient to show that the father of the illegitimate children further adopted them as legitimate by "receiving them into his family," according to the proper construction of section 230 of the Civil Code, which permits of an unmarried man having a "family" con-

sisting of "a collective body of persons living together under one head or manager"; and the word "family" as used therein means no more at most than that the father must have a "home," a settled place of habitation, of which he is the head, into which he must receive the child or children. Such "home" and the reception of the children into it was clearly proved.

ID.—BROTHERS AND SISTERS OF DECEASED NO PART OF "FAMILY."— The brothers and sisters of the deceased, who never lived with him in California, constituted no part of "his family" in this state, within the meaning of section 230 of the Civil Code.

ID.—FINDINGS ALL SUSTAINED BY SUFFICIENT EVIDENCE—PROVINCE OF TRIAL COURT.—It must be held, without regard to the weight of the evidence, of which the trial court is the exclusive judge, that there is sufficient evidence to warrant every finding made by such court.

ID.—TESTIMONY BY ONE OF APPELLANTS' COUNSEL—RULE OF COURT PROHIBITING ARGUMENT—APPELLANTS NOT PREJUDICED.—The appellants were not prejudiced by a rule of court forbidding one counsel, who voluntarily became a witness, to argue the case, where they were not deprived of argument from the leading counsel who tried the case and fully prepared himself to argue the same. Appellants were not deprived of any statutory rights and were not entitled as matter of right to be heard by as many counsel as they may choose.

ID.—POWER OF SUPERVISION BY TRIAL COURT.—The trial court may exercise a reasonable supervision over the arguments of counsel; and, under ordinary circumstances, if a party is allowed full opportunity to present argument by one counsel, he cannot complain of any deprivation of his rights to argument by counsel.

ID.—IMPROPER CROSS-EXAMINATION OF MOTHER—GENERAL SEXUAL INTERCOURSE.—The court properly overruled a general question to the mother of the children, as a witness on cross-examination, as to how many men since her husband had left her she had sexual intercourse with, and "who are they," on the ground that such question was too broad. Evidence as to unchaste conduct of the alleged mother is allowable only in so far as it bears on the question of the paternity of the child, or tends to show that another is or may be the father of the child; and it must be directed to the time or about the time that the child was begotten.

ID.—IMPROPER ATTEMPT AT IMPEACHMENT.—Such question was not admissible for the purpose of impeachment. Questions on cross-examination tending to show the general immorality of the witness or specific acts of immorality should never be allowed in any case for the purpose of discrediting or impeaching the witness. Witnesses can be impeached in no other way than that provided in the Code of Civil Procedure.

ID.—EVIDENCE OF ACT OF SEXUAL INTERCOURSE.—Evidence was admissible to show that a witness discovered an act of sexual intercourse between the mother and the alleged father of the children, whether it

took place before or after the birth of the daughter, as tending to show the extent of the intimacy between them and to corroborate the testimony of the mother as to their paternity and the nature of the relations existing between them.

ID.—WITNESS NOT IMPEACHABLE AS TO COLLATERAL MATTER.—The testimony of a witness on cross-examination as to a purely collateral matter is conclusive, and he cannot be impeached by evidence of contradictory statements as to such collateral matter.

ID.—INADMISSIBLE HEARSAY—FOUNDATION FOR IMPEACHMENT NOT LAID. —The court properly excluded the evidence of a physician to hearsay declarations made by the mother of the children who was not a party to the action that she was in the family way by another person a few months before the birth of the daughter, which was in no way binding on the children as evidence on the question of paternity. Though such evidence might be admissible for the purpose of impeachment, it was not admissible for that purpose, where no foundation was laid for such impeachment on cross-examination of the mother.

ID.—INSTRUCTIONS—ARGUMENTATIVE AND MISLEADING REQUEST—ADOPTION UNDER CODE.—An instruction requested by appellants which was argumentative and misleading as to fraud and perjury by mother of nameless children, and as to the weight of testimony, and informing the jury that to hold that there was an adoption under section 230 of the Civil Code, would require liberality of construction destructive to the statute itself, was properly refused.

ID.—IMPROPER REQUESTS—RECEPTION INTO THE FAMILY.—Requested instructions to the effect that the deceased did not receive his children into his family unless he acknowledged their paternity to every relative, friend, and acquaintance who visited the house after their birth, were properly rejected as erroneous.

ID.—RULINGS UPON EVIDENCE.—*Held,* that there were no other improper or prejudicial rulings upon evidence.

ID.—PETITION FOR PARTIAL DISTRIBUTION—ERRONEOUS FULL DECREE WITH BONDS—PROPERTY TO BE RESERVED.—Upon a petition for partial distribution of an estate at the expiration of four months, it is erroneous to distribute all of the property of the estate, simply reserving bonds to secure debts. Enough property should be reserved not only to cover the entire debts and expenses of administration, but also to secure the payment of the inheritance tax by the distributees under the act of March, 30, 1905.

ID.—FULL DISTRIBUTION NOT PERMISSIBLE PRIOR TO SETTLEMENT OF FINAL ACCOUNT.—The law does not contemplate the distribution of all the property of an estate under partial distribution proceedings or prior to the settlement of the final account of the executor or administrator.

ID.—PARTIAL DISTRIBUTION OF MORTGAGED PROPERTY.—When mortgaged property is included in a decree of partial distribution, if there is a

probability of a deficiency, enough property should be reserved to secure against any deficiency, but if it appears that the mortgaged property is ample security for the whole debt, the debt may be disregarded on partial distribution.

APPEAL from a decree of distribution of the Superior Court of Sonoma County and from an order denying a new trial. Thomas C. Denny, Judge.

The facts are stated in the opinion of the court.

J. A. Barham, and J. W. Rose, and Mastick & Partridge as *Amici Curiæ,* for Appellants.

R. L. Thompson, and C. H. Pond, for Respondents.

ANGELLOTTI, J.—This is an appeal from a decree distributing all of the property of the estate of deceased to William Stephen Bennett and Nellie Florence Bennett, and from an order denying a motion for a new trial made by the administrator of said estate and two brothers and a sister of deceased. The application for distribution was one made under section 1658 of the Code of Civil Procedure by said distributees, claiming to be adopted children of deceased under the provisions of section 230 of the Civil Code. This claim being opposed, the application was heard by the court and an advisory jury, and the latter found in response to questions submitted to them that deceased was the father of said petitioners, that he publicly acknowledged each during its minority as his own child, that he received each during its minority into his family as his own child, and that he otherwise treated each child during its minority as if it was his legitimate child. The trial court adopted these findings of the jury.

It is earnestly contended that the evidence is not sufficient to sustain these findings. All of them are essential to the affirmance of the decree, section 230 of the Civil Code, providing that: "The father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such; and such child is thereupon deemed for all purposes legitimate from the time of its birth." Different views have

been entertained by justices of this court whether the existence of a family into which the child can be received is essential to an adoption under this section, but that question has been finally determined in the affirmative by this court in *Estate of De Laveaga,* 142 Cal. 158, 169, [75 Pac. 790].

Material facts of the case concerning which there is no dispute are as follows: Deceased was born July 29, 1837, and died intestate April 4, 1907, leaving an estate valued at about $21,000. He left two brothers and a sister, the brothers residing in Los Angeles County and the sister residing in the state of Illinois. In 1853 or 1854 he settled in Alexander Valley, Sonoma County, on what was thereafter known as the Gird Ranch, and this continued to be his home until the time of his death. He was never married. No person claiming relationship to him ever resided there with him other than the petitioners here. About the year 1865 or 1866 Mr. and Mrs. Fletcher, husband and wife, came to this ranch, bringing with them a half Indian girl about three years old, called Alice. For a time Fletcher worked for the deceased on the ranch, but left the neighborhood within two or three years and never returned. Mrs. Fletcher and Alice remained on the ranch, Mrs. Fletcher doing the general housework, and Alice helping as she grew older until at the time of her marriage she was doing a great part of the housework and much farm work outside. During all of this time deceased, Mrs. Fletcher, and Alice lived in the same house and ate at the same table, Mrs. Fletcher and Alice sleeping in one room and deceased in another. Deceased was a highly educated man, and took an interest in teaching Alice to read and write. He always treated her kindly and much as any one would treat a child in his household. She finally married one Owen Bennett, and lived with him as his wife for a short time, when they separated and she resumed her life on the Gird Ranch with Mrs. Fletcher and deceased, but the marriage between Bennett and herself was not dissolved until after the death of deceased. The manner of living was the same as before her marriage, she continuing to occupy a sleeping-room with Mrs. Fletcher, and deceased occupying another room. She worked about the ranch as before. She was never paid any wages. On May 22, 1885, she gave birth to William Stephen Bennett, one of the petitioners. Deceased sent for and paid the doctor.

The boy was kept on the place, and there grew to manhood, being treated practically as any boy raised on a farm. As he grew older he worked on the ranch and attended the public school. Deceased always manifested a kindly interest in him and assisted him in his education. He always went by the name of Bennett, and was registered at school under that name. He was never paid any wages for his work. In the year 1895, Mrs. Bennett gave birth to the other petitioner, Nellie Bennett, who thenceforth was one of the household. This child was always known as Nellie Bennett. Deceased always treated her kindly. The evidence very clearly establishes that Mrs. Bennett's husband was not the father of Nellie. It must also be taken as establishing that he was not the father of Stephen. The only evidence as to the year of the marriage was to the effect that it occurred in the year 1880, and there was no evidence to contradict that given to the effect that Bennett and Alice separated not later than the year 1881, and never thereafter cohabited or even saw one another until long after the birth of Nellie, except on one occasion when Alice saw him at a distance, saving and excepting evidence to the effect that Alice had on several occasions admitted to others that Stephen was Bennett's child. The evidence was clearly of such a nature that we cannot say that the jury and court were not warranted in concluding that Stephen was not Bennett's child.

The only evidence that deceased was the father of these children was that given by Alice, and that afforded by the circumstances under which all the parties lived, certain alleged admissions of deceased, and his general treatment of Alice and the children. This evidence was of such a nature that an appellate court cannot hold, however much it may doubt the correctness of the conclusion of the trial court, that the conclusion of the trial court on the question of paternity is without sufficient support in the evidence. Alice testified positively that she commenced to have sexual relations with the deceased in the year 1884, and that he was the father of both Stephen and Nellie. There was evidence given of statements and conduct on her part that was inconsistent with her testimony, but the effect of this attempted impeachment was purely a question for the trial court. Non-access by the husband being clearly shown, or at least being shown to a reasonable certainty,

the positive testimony of Alice as to the paternity of her chil-
dren was competent evidence, and, under the law, sufficient
basis for a finding by the jury on the question of paternity.
It may reasonably be argued that corroboration of her evidence
is to be found in the fact that these children were apparently
accepted by deceased without demur or objection as a part of
his household, and were treated and brought up as his own
children would have been, and that he, Alice, and the children
all continued to live as members of one family ordinarily live.
In addition to this, two witnesses testified positively that just
after the birth of Nellie, deceased declared in their presence,
another person also being present, when some question was
suggested as to the paternity of Nellie, that Stephen and
Nellie were his children, and one of these witnesses testified
that he heard deceased say many times that Stephen was his
son, and Stephen testified that deceased told him that he was
his son.   Learned counsel for appellant is in error in his
claim that a different rule may be applied by this court in
cases of this character, in determining the sufficiency of evi-
dence to sustain the findings, from that applicable in other
cases.   What was said by Justice Fox in the *Matter of Jessup*,
81 Cal. 423, [21 Pac. 976, 22 Pac. 742], quoted in counsel's
brief, was said solely with reference to the proper construc-
tion of a statute from the standpoint of policy, and while it
might constitute good material for argument to the trial court
or jury on the question of the weight to be given by them to
certain evidence, cannot be taken as laying down any rule of
law.   *Estate of Sandford,* 4 Cal. 12, involved no other ques-
tion than whether an alleged written acknowledgment suffi-
ciently complied with the terms of a statute.   In *Hite* v. *Hite,*
124 Cal. 389, [71 Am. St. Rep. 82, 57 Pac. 227], only three of
the justices concurred in any expression of opinion that might
serve as a basis for the contention that an appellate court
would ever review the finding of a trial court in regard to a
matter where there is substantial evidence to support the
finding, and we do not construe anything in the opinion signed
by these three justices as intimating any such doctrine.   By
section 1844 of the Code of Civil Procedure, it is provided:
"The direct evidence of one witness who is entitled to full
credit is sufficient for proof of any fact, except perjury and
treason."   But, says counsel, there are eight separate reasons

why Alice Bennett was not "entitled to full credit," such as. swearing to her own adultery, admissions and inconsistent. acts. In reply we can only point to section 1847 of the Code of Civil Procedure, which, after declaring the manner in which a witness may be impeached, declares, "and the jury are the exclusive judges of his credibility." Both the trial judge and jury concluded that she was a witness entitled to full credit, and their conclusion on that question is not open to review by us. (See *Fowden* v. *Pacific etc. Co.* 149 Cal. 151, 161, [86 Pac. 178].)

We do not deem it open to serious question that the evidence is sufficient to support the conclusion on the part of the trial court that deceased treated both Stephen and Nellie as if they were his legitimate children, and will not unnecessarily prolong this opinion by discussing the evidence in regard thereto. "The criterion referred to in the statute is the treatment usually accorded to legitimate children." (*Estate of Heaton,* 139 Cal. 237, [73 Pac. 186].)

A more serious question exists as to whether the evidence sufficiently shows that deceased publicly acknowledged Stephen and Nellie as his children to sustain the findings of the trial court to that effect. The language of section 230 of the Civil Code, is simply "by publicly acknowledging it as his own." There is no provision as to what shall constitute "a public acknowledgment," and the words of the statute must be taken in their ordinary sense. (*Blythe* v. *Ayres,* 96 Cal. 532, 577, [31 Pac. 915] ; *Townsend* v. *Meneley,* 37 Ind. App. 127, [74 N. E. 274, 76 N. E. 321].) In *Crane* v. *State,* 94 Tenn. 86, [28 S. W. 317], a prosecution for bigamy, the statute provided that the testimony of a bystander who witnessed the ceremony and "the public acknowledgment of the party charged shall be competent evidence." The court said: "Criticism is directed. to the term 'public acknowledgment of the party charged,' and it is insisted that this means some acknowledgment before a court or other public tribunal. We do not so construe the law, but any acknowledgment of the fact of marriage, by confession or conduct, in the presence of one or more individuals, would answer the requirement of the statute. It need not be in the shape of a public avowal, made in the courts, or in the market place, or from a house top, but can be made as well by acts and conduct recognizing the marriage, as by oral statements to

third persons." In *Blythe* v. *Ayres,* 96 Cal. 532, 577, [31 Pac. 915], it was said in the main opinion signed by three of the justices that "this acknowledgment was also public, for as we have seen, the thought of concealment of the paternity of the child never entered his mind." In the light of what is said in the various authorities as to the meaning of such terms as "public acknowledgment," we are of the opinion that there was sufficient evidence to support the conclusion of the trial court. The circumstances surrounding the birth of these children and the conditions existing in the household of deceased before and after their birth, coupled with his treatment of them, and his interest in them, were of such a nature, in the absence of any statement to the contrary by him, as to constitute evidence of a general acknowledgment of paternity to the community. In the face of circumstances which might well be accepted as calling for explanation as to the true situation if he was not the father of these children, he never expressly denied that he was such or made to any living person, so far as the evidence shows, any explanation why these children were accepted by him as a part of his household. Of course, he was under no obligation to make any explanation to any one, but in the absence thereof he could not complain if the community accepted, as they might very reasonably do, that he was the father of these children. In addition to the evidence of this character there was the evidence of his declarations to three persons on the only occasion when the question of the paternity of these children appears to have been raised in his presence, to the effect that they were his children, and also the evidence of a witness to the effect that he had heard deceased on many occasions say that Stephen was his son. It may be proper to say again, as we said in regard to the witness Alice Bennett, that the question of the amount of credit to be given to these witnesses was one solely for the trial court. That the children always went by the name of Bennett and that deceased on two separate occasions introduced Stephen as Mr. Bennett or Mr. Steve Bennett, once to his attorney and once to a stranger, do not destroy the effect of the evidence given in support of the children's claim. Nor is the fact that he did not say anything about the matter to his brother when he visited his home shortly before his death of such importance, under the circumstances, as to forbid the conclusion of public acknowledg-

ment. The many reputable witnesses called by appellants to show absence of express acknowledgment to them or in their presence amounted to no more than that they had never heard any such acknowledgment made by deceased, but as to practically all of such witnesses there was nothing to indicate that there was in the circumstances anything to call for an acknowledgment to them. While the case, both on the question of paternity and that of public acknowledgment, may not be a very strong one in favor of claimants, we are constrained to hold that it was sufficiently strong to support the findings of fact of the trial court thereon, and that being so those findings are conclusive on us however we might decide the matter had we the right to review findings of fact made on conflicting evidence.

It is claimed that the evidence is insufficient to support the conclusion that he received these children "into his family." If his household in Sonoma County is to be regarded as "his family" within the meaning of section 230 of the Civil Code, it cannot be questioned, of course, that the evidence was sufficient. In *Estate of Bennett,* 134 Cal. 323, [66 Pac. 371], this court said: "The meaning which is to be given to the word (family) is to be determined by the context, and also from a consideration of the subject-matter to which it relates. Every case must depend upon its particular circumstances. Mr. Jarman says (Jarman on Wills, p. 941): 'family' is not a technical word, and is of flexible meaning. Anderson's Law Dictionary defines the word: 'In its modern comprehensive meaning, a collective body of persons living together in one house.' It is sometimes used to include parents with their children, whether dwelling together or not. The word has also a broader and secondary meaning, which includes all the offspring or descendants of a common progenitor, but is not to receive this construction unless such intention is manifested from the context." Webster defines it as: "The collection of persons forming a domestic household, including parents, children, servants, and sometimes lodgers." By the Century Dictionary it is declared to be: "The collective body of persons who form one household under one head and one domestic government, including parents, children and servants." In their concurring opinion in *Blythe* v. *Ayres,* 96 Cal. 592, 577, [31 Pac. 927], Justices McFarland and De Haven said: "Either a

widower or a bachelor, as we all know, may have a family, viz., 'a collective body of persons living together under one head or manager.' " In *Garner* v. *Judd,* 136 Cal. 394, [68 Pac. 1026], this court in Bank said, speaking through Chief Justice Beatty: "We have no doubt that when a man has a home where he lives with a woman whom he holds out to the world as his wife, he has a family within the meaning of section 230 of the Civil Code, into which he must receive an illegitimate child in order to legitimate it under that section." In *Estate of De Laveaga,* 142 Cal. 169, [75 Pac. 790], this court was careful to limit its language as to the necessity of the existence of a family into which the child can be received as one of the cardinal conditions prescribed for an adoption under section 230 of the Civil Code, by saying "having a family, *or at least a home in which he can receive him"* is such a condition. The words of section 230, "receiving it . . . into his family," imply a receiving into a place of which he is the head, of which he has control. As used in this section, the word "family," in our opinion, means no more at most than that the father must have a "home," a settled place of habitation of which he is the head, into which he must receive the child, such receiving to be with the consent of his wife if he be married. The brothers and sisters of deceased, who never lived with him in California, constituted no part of his "family" within the meaning of that section.

It is claimed that the trial court committed many errors in the trial of this case.

On objection of respondents, the trial court precluded J. W. Rose, Esq., one of appellants' two attorneys, from arguing the case to the jury or the court. The reason for this action on the part of the trial court was that Mr. Rose was an important witness for appellants and testified on their behalf, and there was a rule of the court purporting to preclude counsel who gave evidence in a case from participating in the argument thereof. The evidence given by Mr. Rose related to matters of such a nature that it must have been known before the commencement of the trial that he would necessarily be a witness, and at the time he was called as a witness he was warned by the court that he would be precluded from arguing the case if he testified. The reason for the refusal was stated by the court in the presence of the jury to be that the rule precluded

CLVII Cal.—35

one who was a witness from arguing a case. The suggestion that the court by this refusal cast any reflection on Mr. Rose or his evidence is unwarranted. We do not deem it necessary to discuss the question of the validity of the rule of the superior court of Sonoma County invoked by respondents. We can well see that the facts of a case might be such as to make its application such an unwarranted deprivation of a party's rights as to constitute an abuse of discretion. In this case appellants were not deprived of the right to argue this case by counsel of their own selection. The record shows that J. A. Barham, Esq., was one of the attorneys of record for appellants, participating throughout all the proceedings in this case, and practically conducting the trial on the part of the appellants. It further shows that the cause was argued to the jury by respective counsel. Counsel were fully advised by the court at the time Mr. Rose was called as a witness that he would thereby render himself ineligible to argue the case as counsel, and we are warranted in assuming that Judge Barham made his preparation for argument accordingly. Without intending to reflect in the slightest degree upon the ability of Mr. Rose in the matter of argument to a jury, we have no hesitation in saying that it would be absurd to hold that any prejudice may have accrued to appellants by reason of the refusal of the court to allow any additional argument to that of Judge Barham, especially when they were fully advised a sufficient time before argument that such would be the ruling of the court. Appellants were not deprived of any statutory right. Parties are not entitled as a matter of right to be heard by as many separate attorneys as they see fit to present. The trial court may exercise a reasonable supervision of such matters, and under ordinary circumstances if a party is allowed full opportunity to present argument by one counsel, he cannot complain of any deprivation of his rights in this behalf. Certainly no statute prescribes that he shall be entitled to present separate arguments by different counsel.

Alice Bennett was asked on cross-examination: "Since Mr. Bennett left how many men have you had sexual intercourse with, and who are they?" An objection to this question was sustained, the court holding that the question was too general as to time and should be confined to the "time or around the

time of gestation." A subsequent question of the same nature
directed to "at or about the time immediately before the con-
ception of Nellie" was then asked, and the witness answered
that deceased was the only one. Error is alleged in sustaining
the objection to the former of these questions. The authorities
are practically in accord to the effect that evidence tending to
show unchaste conduct of the alleged mother with other men is
allowable only in so far as it has a bearing upon the question
of the paternity of the child—in so far as it tends to show that
another is or may be the father of the child, and hence that it
must be directed to a time at or about the time the child was
begotten. (See 3 Am. & Eng. Ency. of Law, 2d ed., 822; 5
Cyc., p. 661; *State* v. *Lavin,* 80 Iowa 555, [46 N. W. 553].)
The question here, one directed solely to mere acts of sexual
intercourse, was not so confined, but, on the contrary, em-
braced a period of over twenty years. The only other basis on
which it could be claimed to be a proper question was that of
impeachment of the witness. But it is thoroughly settled that
"questions on cross-examination, tending to show the general
immorality of the witness, or specific acts of immorality, should
never be allowed in any case for the mere purpose of dis-
crediting or impeaching the witness. . . . The Code of Civil
Procedure prescribes the method of impeaching witnesses, and
they can be impeached in no other way than therein provided."
(*People* v. *Harlan,* 133 Cal. 16, 20, [65 Pac. 9, 10]. See, also,
*Sharon* v. *Sharon,* 79 Cal. 673, [22 Pac. 26, 131].) The ruling
of the trial court sustaining the objection was correct.

Complaint is made that the court should have stricken
out certain evidence given by witness Sanders. The evidence
was given on direct examination without objection and was
practically that he had come upon deceased and Alice while
they were engaged in an act of sexual intercourse. On cross-
examination it was developed that the witness was uncertain
whether the incident occurred shortly before or shortly after
the birth of Nellie, the younger child. The motion to strike out
was based on the ground that the witness said it was after the
birth of Nellie. Assuming this to be so we nevertheless are of
the opinion that the evidence was proper as tending to show
the extent of the intimacy between Alice and the alleged father
of her children and to corroborate the testimony of Alice as to
the nature of the relations existing between them as members

of the same household before and after the birth of Nellie. In
*People* v. *Jamison*, 124 Mich. 164, [82 N. W. 835], a bastardy
case, it was held that "acts of intercourse and undue familiar-
ity both before and after the alleged act resulting in concep-
tion are admissible, as bearing upon the probability of the in-
tercourse at the time stated in the complaint." See, also, 5
Cyc. 662, declaring that evidence of the intimate relations
existing between the mother and alleged father is admissible,
and that evidence of previous or subsequent intercourse is com-
petent to show the probability of the particular act having
occurred.

The trial court did not err in sustaining objections to ques-
tions asked witnesses Ralph Rose and Arthur Cochrane for the
purpose of showing that witness Sanders, who had testified to
declarations on the part of deceased, stated shortly before the
trial that he kept a memorandum of all the things that de-
ceased told him during his stay at the Gird Ranch. On his
cross-examination by appellants, Sanders had testified that he
never kept such a memorandum, and that he did not remember
telling Rose and Cochrane that he had done so. This was
clearly a collateral matter elicited on cross-examination. In
*Faulkner* v. *Rondoni*, 104 Cal. 148, [37 Pac. 886], it was said,
quoting from *People* v. *Devine*, 44 Cal. 448: "A recognized
rule, or rather qualification of the rule, governing the impeach-
ment of the credit of a witness by proof of contradictory state-
ments elsewhere made by him, is that the matter involved in the
supposed contradiction must not itself be merely collateral in
its character, but must be relevant to the issue being tried,"
citing many authorities. (See 1 Greenleaf on Evidence, secs.
449 and 461 e and f.) As to such a collateral matter, the
answer of Sanders could not be contradicted by appellants,
but was conclusive on them.

It was sought by appellants to show certain declarations by
Alice to a physician, Dr. Coffman, some few months before the
birth of Nellie, to the effect that she was "in the family way"
by one Smith, and that she desired to be rid of the child by an
operation. This proposed evidence was properly excluded by
the trial court. Alice was not a party to this proceeding, but
only a witness on behalf of her children. Evidence of these
declarations by her to the physician would have been pure
hearsay, in no way binding on her children as evidence on the

question of paternity. Being contrary to her evidence given on that question, the declarations, waiving other objections thereto, would have been admissible by way of impeachment of Alice as a witness, but a complete answer to appellants' claim in this regard is that no foundation was laid for any such impeachment on the examination of Alice.

There was no error in refusing to give appellants' requested instruction I, commencing "I instruct you that of the women who are mothers of nameless children, there are few indeed who would hesitate at fraud, or to whom perjury would seem a crime," etc. It was not only open to the objection of being in part pure argument in favor of appellants' side of the case and an instruction on the weight to be accorded the testimony of certain witnesses, but it also in terms informed the jury that to hold that there had been an adoption under section 230, of the Civil Code, would require "liberality of construction destructive of language, of the statute itself." There was no prejudicial error in modifying appellants' requested instruction III. Appellants' requested instructions IV and V were properly refused. They were to the effect that deceased did not receive the children into his family unless he acknowledged his paternity to every relative, friend and acquaintance who visited his house after their birth. This certainly is not the law.

It was established without conflict that there were always several hired men working on the Gird Ranch. Exclusion of other evidence going simply to that extent was, therefore, not prejudicial error.

If any of the rulings sustaining objections to questions asked Sanders on his cross-examination for the purpose of showing bias on his part were erroneous, the effect of the errors was obviated by the testimony given by the witness, in which he fully covered the subject-matter of such questions.

The refusal of the trial court to allow the witness Hopper to testify as to the contents of a letter said by him to have been given to him by Alice to be given to Smith was not prejudicially erroneous. The theory of appellants was that the letter contained statements by Alice showing that Smith was the father of Nellie. But Hopper fully testified as to statements then and at other times to the same effect made by Alice to him. Additional evidence by him showing similar statements by her in a

lost writing could not have added to the effect of his evidence already given.

What we have said disposes of all points made in appellants' briefs that require notice, except the claim that the trial court erred in distributing all the residue of the estate to the petitioners. It must be held that there is merit in this claim. The application of petitioners was one under sections 1658 et seq. of the Code of Civil Procedure, the sections relating to "partial distribution prior to final settlement," there having been no presentation of the accounts of the administrator, a prerequisite to final distribution. By the decree all the property of deceased, both real and personal, and specifically all cash, money in bank, and every other article of personal property, is distributed to the petitioners share and share alike, and, the bond for two thousand dollars required by the court of each petitioner under section 1661 of the Code of Civil Procedure having already been given, the decree orders the administrator to forthwith deliver to the petitioners all of the property distributed. While the trial court might have been warranted in finding that all debts of the deceased except the mortgage debt had been paid, it did not so find. It did find to the contrary that "the estate . . . is but *little* indebted, and may be distributed as prayed for without loss to the *creditors* of said estate," evidently proceeding upon the theory that the creditors would be protected by the bonds ordered. It is manifest that our law does not contemplate the distribution of *all* the property of an estate under partial distribution proceedings or prior to the settlement of the final account of the executor or administrator. Such a distribution can be had only upon the final settlement of the accounts of the executor or administrator, or thereafter. (Code Civ. Proc., sec. 1665.) The court in probate must necessarily retain until such time what may reasonably be anticipated as necessary to pay debts and expenses of administration. "Creditors are not to be deprived of their lien upon the assets of the estate, and given a bond in lieu thereof. The court should see that sufficient assets are left, after partial distribution, to pay them, without recourse to the bond. The requirement of a bond is only additional security to provide against unforeseen liabilities, and against errors in judgment." (*In re Painter*, 115 Cal. 635, 641, [47 Pac. 700].) This is as applicable to expenses of administration

as it is to debts of the deceased. The court here should have distributed to the petitioners a portion only of the residue of the property, reserving what it deemed a sufficient portion to pay any unpaid claims (including any probable deficiency on the mortgage claim, if any), and also to pay such expenses of administration as had been incurred and remained unpaid, and also such expenses of administration as might reasonably be incurred prior to settlement of the final account. If the land mortgaged constituted ample security for the mortgage debt, such debt could be disregarded so far as partial distribution was concerned, the land mortgaged being subject to the mortgage after distribution as before. (Code Civ. Proc., sec. 1661; *Estate of Mitchell,* 121 Cal. 394, [53 Pac. 810].) Nothing has been said on this appeal as to the inheritance tax due under the act of 1905, which, of course, is also payable out of the property remaining for distribution.

The decree of distribution appealed from is reversed and the matter remanded, with directions to the lower court to make a decree of partial distribution to the petitioners upon the findings and decision filed July 27, 1909, distributing to said petitioners all the property of decedent except such portion thereof as it may deem advisable to retain until final settlement of the accounts of the administrator for the purpose of paying debts and expenses of administration, upon the giving of such bond by the distributees under section 1661 of the Code of Civil Procedure as the court may deem proper and subject to the payment by the distributees of the amounts due as inheritance tax under the act of March 20, 1905. (Stats. 1905, p. 341.) The order denying a new trial is affirmed.

Shaw, J., and Sloss, J., concurred.

Hearing in Bank denied.