[Civ. No. 23384.   Second Dist., Div. One.   Dec. 17, 1958.]

Estate of ROBERT VALENTINO ABATE, Deceased. PEARL P. MARLOW, Appellant, v. DANIEL A. KIRSCH, as Guardian, etc., Respondent.

*Assigned by Chairman of Judicial Council.

284

Henry Merton for Appellant.

Daniel A. Kirsch, in pro. per., Charles E. Taintor, Scott Weller and Raymond A. Nelson for Respondent.

LILLIE, J.—Upon the admission to probate of decedent's will, Robert V. Abate, Jr., a minor, through his guardian ad litem, filed a petition and statement of claim of interest, purporting to be his legitimate son and entitled to the entire estate. Appellant Pearl P. Marlow, executrix under the will, likewise filed a petition in her individual capacity, claiming to be the surviving wife. After a four-day hearing on both petitions, the trial court rendered judgment declaring Robert V. Abate, Jr. to be the son of decedent, his legitimate son for all purposes from the time of his birth, his pretermitted child and entitled to distribution of one-half of the estate; and Pearl P. Marlow to be the putative wife of decedent, entitled to one-half of the estate under the will, and that all of the estate constituted decedent's separate property. From this judgment Pearl P. Marlow appeals, contending that it lacks support in the evidence.

Robert V. Abate died testate August 25, 1956, in Los Angeles, possessed of estate in Orange and Los Angeles Counties. Appellant claims she was married to decedent on

July 21, 1945, at San Diego. They lived together as husband and wife until their separation September 26, 1955. During this time decedent accumulated a sizeable estate including a home in Balboa which was held in joint tenancy. Upon their separation, and pursuant to an agreement, appellant transferred to decedent her interest in the Balboa property, for which he paid her $10,000. On September 26, 1955, he executed the instant will. Appellant thereafter resided apart from decedent, obtained separate employment and resumed her maiden name of Marlow. No divorce action was ever filed.

In August of 1955, decedent, then 43 years of age, met Thelma Stober. In October they engaged in intimacies and thereafter, in December, Thelma became pregnant. Upon learning of this, and in February of 1956, decedent rented an apartment on Bonnie Brae Avenue in Los Angeles, where he and Thelma, although never married, resided together as husband and wife until decedent's death on August 25, 1956. The child was born 15 days before, on August 10, 1956.

On the issue of adoption by legitimation, respondent relied upon section 230, Civil Code, which provides: "The father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such; and such child is thereupon deemed for all purposes legitimate from the time of its birth."

Uncontradicted is the testimony of Thelma Stober that she had intimate relations with decedent commencing in October, 1955, and had not been intimate with any other man since then. Her testimony further shows that when she told decedent she was pregnant, he told her he "always wanted a child with the woman he loved," and established a home for them both by renting an apartment on Bonnie Brae Avenue where they lived together until his death. He bought her a ring, placed it on her finger telling her that "in the sight of God's eyes we are married," and opened up a joint bank account in their names. They sent out printed "wedding announcements" (Exhibit A), to all their friends and relatives, thereafter purported themselves as husband and wife, and Thelma took the name of Mrs. Abate. They travelled together in the performance of his duties arising out of certain of his health lecture tours and made a visit to her family in Washington.

Appellant testified decedent had told her he was sterile.

Thelma, however, testified that she and decedent had discussed the matter of his sterility because he knew how she felt about children, and how much she loved him; and he told her he had become sterile after a plane accident, but that the doctors had assured him it was nothing permanent. Photographs of decedent were received in evidence for the court's comparison of his features with those of the child, as were the child's blood tests which were compared with decedent's hospital records showing the blood types were such as not to preclude paternity. There is nothing improbable about Thelma's story and the trial judge, as he had a right to do, after determining the credibility of the witnesses and weighing the evidence, accepted her testimony and that of her witnesses as true.

Conceding that if the trial court believed Thelma Stober's testimony, it was justified in finding decedent was the father of the minor, appellant claims decedent did not publicly acknowledge the child as his own as he is required to do under section 230, Civil Code. She argues that his only statements acknowledging the child were made by decedent to Thelma, her sister Marcella and a friend, Pearl Campbell, at times he was ill and under the "influence of sedation," and at most they were only private admissions of paternity, which are insufficient to constitute public acknowledgment. She submits that no such statements were made outside the family circle and decedent at no time acknowledged paternity to his friends, family, relatives or associates; that although decedent introduced the child's mother at the hospital to Mrs. Bressert, manager of an apartment house he owned in Balboa, as "Thelma," he did not disclose who she was or his relations with her; that he did not tell his sister Celeste about Thelma, referring to her on one occasion outside of her presence as his nurse; and that he told appellant when she took him to the Hoxy Clinic in Texas, several days before his death, he was not the father of Thelma's baby.

On the other hand, the record discloses that upon learning of her pregnancy, decedent made his home with Thelma in Los Angeles where he lived with her as her husband, leaving only occasionally to visit his property in Balboa and to continue his lecture tours on which Thelma accompanied him; and that twice he returned from the hospital to his home with Thelma and finally from the clinic in Texas to die there. Of significance is the fact that the child was born August 10, 1956, and decedent lived only 15 days thereafter. During this time he was incurably ill with cancer,

struggling to keep alive. There is no evidence that during that time he was under the "influence of sedation" or under "heavy sedation" as claimed by appellant in her brief, although the record does show that he took sedation upon retiring and after eating. While decedent lived with Thelma from February, 1956, to his death, he was in the hospital on two occasions, from June 23 to July 28, and from August 11 to August 16; and after the child's birth, from August 21 to August 24, he was in the Hoxy Clinic in Texas. During this time he was critically ill, which left him little opportunity to declare to anyone outside his family circle that he was the father of the child. There was little reason to declare the same to Thelma, her sister, and her friend, for in providing and maintaining a home for her, and living with her in a normal "husband and wife" relationship, he set up as against the world a "legitimate household." As to their friends and relatives, he and Thelma had previously declared they were married by sending "wedding announcements" which would leave no reason for decedent to make any declaration to them that the child was his. Obviously anyone having been told of the "marriage" would naturally assume that the child was "legitimate." As any proud father, when he first saw the child in their home upon his arrival from the hospital, he walked over to the crib and said, "so this is my son." He referred on numerous occasions to the boy as "my son" to those around him—Thelma and her friend and sister, apparently the only visitors they had. At one time after watching Thelma turn the baby on his stomach, he said, "I wish I was well enough to enjoy him." In a telephone call to one of his doctors in the hospital, decedent told him immediately after the birth of the child "the baby was grand." Decedent participated in making a list of things the baby needed, gave Marcella money to buy them and the keys to his car and sent her shopping for the items, saying: "I want the best for him." The evidence further shows that when Thelma went to the hospital for the birth of the child, only 15 days before decedent died, there was no one in the apartment to care for the decedent and she called his sister to take him to the City of Hope where he could be cared for until she could return from the hospital and do so herself. His sister took decedent to the City of Hope and he returned to the apartment on the same day Thelma returned from the hospital after the birth of the child. His treatment and care at the hospital at that time is a reasonable explanation why Thelma alone gave

information concerning the child and his name as Robert V. Abate, Jr., for the birth certificate, and why he did not visit her in the hospital or contact the hospital or her doctors. On the very day Thelma brought the baby home, decedent arranged to and did return there from the City of Hope. It is obvious from the trial judge's findings he accepted Thelma's testimony and that of her witnesses and believed, under the unusual circumstances, that decedent's acts and conduct toward the child and his statements to those near him were sufficient to constitute public acknowledgment.

As to decedent's relatives, friends and associates, considering the very serious illness of decedent, his extended hospital visits and the short time he lived after the baby's birth, decedent would have gone out little on business or socially, there would have been few visitors in the household, little opportunity to have made any declaration concerning the child and little interest in much outside of decedent's health. Excluding for the moment appellant's testimony that decedent on his trip to the Hoxy Clinic several days before his death told her he was not the child's father, appellant produced no evidence that decedent ever denied paternity. Even giving credence to the testimony of Mrs. Bressert, the manager of decedent's property in Balboa, that decedent introduced Thelma only by name and made no explanation of their relationship or that they were expecting a child, we see no reason under the circumstances why he should, or would, have made any explanation to an employee, absent any inquiry concerning the matter. The fact, if it be so, that decedent did not tell his sister about Thelma, or mention the child, means little on the issue under the circumstances. The evidence does not show that either Celeste or Mrs. Bressert asked decedent about his relations with Thelma, who she was, or anything concerning the child. Omissions alone, under these circumstances, do not seem to us to support a purposeful concealment, or wilful misrepresentation of paternity. (*Estate of Baird*, 193 Cal. 225 [223 P 974].) The court in *Estate of Gird*, 157 Cal. 534, at pages 542, 543 [108 P. 499, 137 Am.St. Rep. 131], stated along this line: "The language of Section 230 of the Civil Code, is simply 'by publicly acknowledging it as his own.' There is no provision as to what shall constitute a 'public acknowledgment,' and the words of the statute must be taken in their ordinary sense. . . . In the face of circumstances which might well be accepted as calling for explanation as to the true situation if he was not the father of these

children, he never expressly denied that he was such. . . . Nor is the fact that he did not say anything about the matter to his brother when he visited his home shortly before his death of such importance, under the circumstances, as to forbid the conclusion of public acknowledgment.''

Reference is made to appellant's testimony that when she escorted defendant to the Hoxy Clinic in Texas, several days before his death, he told her for the first time about Thelma, of having had an altercation with her, that he was not the father of her child, that she was in the family way when he met her, and wanted to return to Los Angeles immediately to prevent her from drawing the money out of their joint bank accounts; and that when he arrived in Los Angeles, he went to the bank and drew out $1,200. Appellant contends that this conversation and his action in drawing funds from his account prove decedent denied paternity, did not receive the child into ''his family'' and did not have his wife's consent therefor, and that he intended to make no provision for the child. On this point, Thelma's testimony discloses that on June 20, 1956, before he went to the city of Hope for surgery, decedent made out four pink cards and had her sign them for joint accounts in the bank, stating to her at the time that they represented $50,000 cash, and instructed her that upon his death she was to immediately take the bankbooks to the bank and get the money, that he put the cards into his briefcase where he kept them at all times, that he took his briefcase with him when he left with appellant for Texas, but when he returned the cards were no longer in the case. The controversy concerning the missing bankbooks speaks for itself, and this may have been one of the factors considered by the trial judge in determining credibility of the witnesses and weighing the evidence.

In the instant case the issue of legitimation is primarily factual. It was for the trial judge to resolve any conflict in the evidence. (*Estate of Gird*, 157 Cal. 534, 544 [108 P. 499, 137 Am.St.Rep. 131].) He obviously accepted the respondent's version of what occurred and this court may assume that he rejected appellant's conflicting evidence. Each case depends upon its own circumstances. (*Estate of Baird*, 193 Cal. 225 [223 P. 974].) Those in the instant case are unusual, but we conclude in consideration of decedent's serious illness, the short time he lived after the birth of the child and from his conduct and treatment of the child, that he had every

intention and desire to treat him as his own, that he felt the natural affection of a father for his child and that he desired to, and did, care for and assume responsibility for his maintenance, care and support. He rented the apartment as a home for the three of them and lived in it as his home, returned to it as his home and died in it. After Thelma was no longer able to work, he supported her and the child, providing all the necessities for both, and on occasion did the shopping himself. He referred to the baby as "his son" to members of Thelma's family, Thelma and her friend, and talked about "the baby" to his doctor. Any lack of mention of the child in his conversation with an employee, or his sister who had never seen him, at times when he was not called upon to discuss the child, even if the trial court attached credence to their testimony, we do not believe to be sufficient to overbalance the weight of his deliberate admissions and his acts and conduct toward the boy and his mother.

Appellant contends that decedent did not receive the child into his family with the consent of his wife. The evidence before us is insufficient for the trial court to have found appellant was the legal wife of decedent. Therefore, her consent was not necessary and as such, she could not constitute the "family" referred to in the code section. It is clear from the record that the only "family" decedent had consisted of Thelma, for whom he maintained the only home he had. Under these circumstances, it is clear that the case of *Laugenour* v. *Fogg*, 48 Cal.App.2d 848 [120 P.2d 690], relied upon by appellant is inapplicable. In that case, the father of the child was married, left his legal wife and lived with the mother of the illegitimate child without the consent of his wife. In holding that the establishment of the "home" with the mother of the child did not satisfy the requirement of section 230, the court said, at page 852: "It is true that it has been held, and it may be conceded to be the present rule, that a single man may establish a home with his paramour and there rear the offspring without the sanctity or formality of a marriage. The reasoning of these cases is that every man can lawfully claim a home; if married the home is where the wife and family reside and if single he may still provide this home for whomsoever he chooses to establish the marital relation, even without the conventions." Referring again to the *Estate of Baird*, 193 Cal. 225, the court stated, at page 278 [223 P. 974] : "In respect to the issue of receipt into family we will adopt the definition of 'family' given in *Estate of*

*Gird, supra,* as stated at page 545: 'As used in this section, the word "family," in our opinion, means no more at most than that the father must have a "home," *a settled place of habitation of which he is the head,* into which he must receive the child.' '' And at page 279, the court said: "It has been held that where the father of an illegitimate child lives in a home alone, such home may constitute a 'family' into which he may receive the child, or where the father and mother of an illegitimate child live in a home or habitation of which the former is the head, although they are not married, the father has a 'family' within the meaning of section 230, into which the illegitimate child may be received."

The record before us contains ample evidence that all requirements of section 230, Civil Code, have been complied with and by reason thereof and the public policy of this state favoring legitimation we deem the minor, for all purposes, to be legitimate from the time of his birth. (*Blythe* v. *Ayres,* 96 Cal. 532 [31 P. 915, 19 L.R.A. 40]; *Estate of Lund,* 26 Cal.2d 472 [159 P.2d 643, 162 A.L.R. 606].)

On the issue of marriage, the trial court found that appellant was not the legal wife of decedent and at most the relationship established a putative marriage. To reverse this portion of the judgment, appellant relies upon a "ceremony" performed July 21, 1945, in San Diego by a "naval chaplain" wherein wedding bands were exchanged; cohabitation for 10 years as husband and wife; the joint acquisition of property and conduct of his business; and their devotion to each other. She submits this evidence establishes a presumption of the existence of a legal marriage. We conclude that any such claimed presumption was rebutted by the evidence. No marriage license or any record of their marriage was produced and appellant testified that they had not lived together as man and wife prior to their purported marriage. She further testified that decedent had told her he had made all arrangements for the marriage and she relied upon him; that she could not locate the "chaplain" who performed the ceremony but that it took place in an aircraft factory; that she could not find the marriage license although she had described it as a white, green-embossed document; that upon their separation, and prior to signing the property agreement on September 26, 1955, the decedent, in order to keep control of the property, told her she could not prove they were married; that they were not really married and only the two of them knew of the marriage ceremony; and that a lawyer prepared

the property agreement which she executed, after which she resided apart from decedent, found separate employment and assumed her maiden name of Marlow.

Significant is the fact that appellant did not sue for a divorce although she testified ''she wanted a divorce,'' did not consult with counsel to determine her rights, did not attempt to have the validity of the marriage determined and declared by the court, and the September 26, 1955, agreement between her and decedent was one drawn between Robert V. Abate and Pearl P. Marlow, also known as Mrs. Robert V. Abate, which she signed as ''Pearl P. Marlow.'' The agreement declares, among other things, ''Whereas, the parties hereto have lived together as husband and wife.'' From appellant's own evidence and the fact no marriage license or other record of a legal marriage was produced, the trial court found that a valid marriage did not exist.

It appears to this court that if, in California, any record of the marriage existed as required by law, the fact of a legal marriage would not have been difficult to prove, for appellant knew the exact date and place of the purported ''ceremony.'' On July 21, 1945, the Civil Code in this state required for a valid marriage a solemnization (§ 55); that a marriage must be licensed, solemnized, authenticated, and recorded (§ 68); and that the parties ''must'' first obtain a license therefor from the county clerk of the county in which the marriage is to be celebrated (§ 69) and ''must'' obtain from the same clerk, in addition, a certificate of registry (§ 69a). Civil Code, sections 72, 73 and 74, provide that the person solemnizing a marriage ''must'' require presentation of the marriage license, ''must'' make, sign and endorse upon the license a certification showing the solemnization, names of witnesses and his official position, and file the license and certification with the county recorder within 30 days.

The evidence does not disclose if the so-called ''naval chaplain'' was actually a navy chaplain and a person authorized by statute (Civ. Code, § 70) to solemnize marriages in California. ■ Unless a solemnization is performed as authorized under the code and performed by one mentioned in section 70, there can be no valid marriage (*Norman* v. *Norman*, 121 Cal. 620 [54 P. 143, 66 Am.St.Rep. 74, 42 L.R.A. 343]). The court in that case also held that noncompliance of the parties to a marriage with the provisions of section 68 invalidates the marriage and the court finding there was no license and no

solemnization by any person authorized by law to perform the ceremony, held there was no valid marriage. Solemnization is essential to a valid marriage in California (*Estate of Shipp,* 168 Cal. 640 [144 P. 143]; *Temescal Rock Co.* v. *Industrial Accident Com.,* 180 Cal. 637 [182 P. 447, 13 A.L.R. 683].)

On appellant's last point concerning the status of the decedent's property, she submits that with the exception of $15,000 his estate was acquired as the result of the earnings of appellant and decedent during the time they lived together and was not his separate property. She recites testimony that they were engaged in business together from July 21, 1945, to September 26, 1955, that she worked hard in their joint interest, lived with decedent under frugal circumstances and that their average income was approximately $2,000 per month.

The record before us does not disclose the actual estate of decedent as of July 21, 1945, the date of the purported marriage, other than the statement of appellant that he said he had $15,000 which was his separate property. Appellant took care of decedent's books, but she offered no substantial evidence from the books or otherwise concerning if, or in what manner, the $15,000 was invested, whether his subsequent income was the result of his efforts, or from investments and accumulation of this sum over the eleven year period, and none from the books concerning the amount of income of decedent from July, 1945, to September, 1955.

Pursuant to the property agreement of September 26, 1955, decedent paid appellant $10,000 for her interest in the Balboa property. What other estate he owned we do not know. In addition, the agreement of September 26, 1955, executed by the parties recited ''Whereas they desire to divide between themselves the property which they have accumulated,'' and provided for mutual release of all claims upon the property of the other. As to whether the agreement was the result of any fraud or fraudulent conduct on the part of decedent and not binding, the trial court found from the evidence it was valid and that no fraud was practiced on appellant, and her consent was not induced as the result of any fraud or imposition.

Weighing the evidence and resolving any and all conflicts in the evidence, the trial court found that all of the property in the name of decedent at the date of his death was his separate property. There was no evidence that any property

existed that would have been community had there been a valid marriage.

We conclude that the evidence was sufficient to sustain the trial judge's finding that the estate is the separate property of decedent. Therefore, no issue arises as to succession of community property under sections 201-203, Probate Code, or as to the rights of a putative spouse in property which would have been community property had there been a valid marriage. ▮ Since the will contains no provision for the child, no disinheritance clause and no provision was made for him by settlement, or otherwise, it appears that the minor is a pretermitted heir of the decedent (Prob. Code, § 90).

Judgment is affirmed.

White, P. J., and Fourt, J., concurred.

A petition for a rehearing was denied January 7, 1959, and appellant's petition for a hearing by the Supreme Court was denied February 11, 1959.