[Sac. No. 2032.   Department One.—August 27, 1913.]

In the Matter of the Estate of WILLIAM JONES, Deceased.
   LAURA ALICE BAKER, as Guardian of Lester William
   Jones,   a   Minor,   Contestant   and   Respondent,   v.
   CHARLES G. JONES, as Executor etc. of William
   Jones, Deceased, Proponent and Appellant.

WILL—CONTESTING PROBATE—UNDUE INFLUENCE—EVIDENCE.—On an ap-
   peal from an order revoking the probate of a will on the ground of
   undue influence, it is held, that while there was no direct evidence of
   undue influence, there was proof of circumstances from which the
   jury might with reason have inferred that the beneficiary of the will
   and certain other persons conspired to procure its execution, and that,
   taking advantage of the weak condition of the testator in his last
   sickness, they prevailed upon him to make the will in question, con-
   trary to his real wishes and intentions.

ID.—MENTAL INCOMPETENCY—EVIDENCE.—Notwithstanding the direct
   evidence of the persons who were present at the time of the execu-
   tion of the will, to the effect that the testator was then of sound and
   disposing mind, it is held, that there was other evidence sufficient to
   sustain the conclusion of the jury that the testator was then suffer-
   ing from such unsoundness of mind as to be incapable of executing
   the will.

ID.—PARENT AND CHILD—ADOPTION OF ILLEGITIMATE CHILD BY FATHER—
   ACKNOWLEDGMENT OF PATERNITY.—In this proceeding, which in-
   volved the question of the adoption of the contestant by the testator,
   as his legitimate son, within the meaning of section 230 of the Civil
   Code, it is held that the evidence showed without conflict that the
   contestant was the illegitimate son of the testator, and also showed,
   sufficiently to meet the requirements of that section, that the testator
   had acknowledged the contestant to be his own child many times,
   willingly and on all occasions, as the father of a legitimate child
   would naturally do.

ID.—HOME OF UNMARRIED MAN—RECEPTION OF CHILD INTO FAMILY OF
   FATHER.—The residence and dwelling-house of an unmarried man,
   which is his fixed place of abode, is his home, although, for long
   periods of time, he is accustomed to live in the house alone; and if
   he takes his illegitimate child to live with him there, the place would
   be the home of his family, and the child would be received into his
   family, within the meaning of section 230 of the Civil Code, although
   the family may then consist of but the two persons.

ID.—VISIT OF CHILD AND MOTHER AT HOME OF FATHER—SUFFICIENT RE-
   CEPTION INTO FAMILY OF FATHER.—Where an unmarried man, having

a fixed place of abode on a mountainous cattle ranch, in which he was accustomed to live alone for long periods of time, invited his publicly acknowledged illegitimate son, then of tender years, and the child's mother, to come to his ranch and remain there with him for awhile to benefit the boy's health, and the invitation was accepted by them, the continued residence of the child for a period of two months with the father in his own home was a reception into his family as his own child, and a sufficient compliance with the requirements of section 230 of the Civil Code in that particular to constitute an adoption of the child.

ID.—DUAL FAMILY RELATION OF ILLEGITIMATE CHILD.—Where the father and mother of a child have been divorced, or have not been married, and live apart and have separate and distinct families, the child must often have a dual family relation as a member of each family. If under such conditions the two families should come together as one, the child would be, during that period of time, as much a member of the father's family as of the mother's, and this would make a reception into his family sufficient to carry out the purpose and object of section 230 of the Civil Code.

ID.—TREATING ILLEGITIMATE CHILD AS LEGITIMATE.—Evidence that before and after such visit the father claimed the paternity of the child, visited it often, contributed continuously to its support, had a paternal affection for it, and that his conduct and feelings toward it were substantially the same as those of a father toward a legitimate child under similar circumstances, is sufficient to show that the father "otherwise treated it as if it were a legitimate child," within the meaning of section 230 of the Civil Code.

ID.—EVIDENCE OF UNDUE INFLUENCE—PAST TESTAMENTARY STATEMENTS OF TESTATOR.—On a contest to revoke the probate of a will on the grounds of undue influence and insanity, statements of the testator made subsequent to the execution of the will, avowedly offered by the contestant to show that the will had been produced by and was the result of undue influence upon the testator, are not part of the *res gestae* of the execution of the will, and are inadmissible as hearsay for the purpose of establishing undue influence.

ID.—IMMATERIAL ERROR—PROBATE DENIED ON ACCOUNT OF TESTATOR'S INSANITY.—The erroneous admission of such evidence, although it must be presumed to have been prejudicial to the proponent on the issue of undue influence, will not warrant a reversal of the judgment revoking the probate of the will, which was based upon separate verdicts of the jury finding in favor of the contestant upon each of the issues of undue influence and insanity, if the evidence was sufficient to support the verdict on the latter issue.

ID.—JURY—TRIAL JUROR MEMBER OF GRAND JURY—CHALLENGE INTERPOSED AFTER COMMENCEMENT OF TRIAL—WAIVER.—After the trial of such contest had proceeded for several days, the court did not

abuse its discretion in denying a challenge then for the first time interposed by the proponent to certain of the trial jurors on the ground that they were members of the grand jury of the county, if no reason was offered by the proponent for his failure to ascertain such fact before the jury was sworn. Under the circumstances, the right to challenge the jurors on that ground must be deemed to have been waived.

APPEAL from an order of the Superior Court of Merced County revoking the probate of a will. E. N. Rector, Judge.

The facts are stated in the opinion of the court.

John Ralph Wilson, J. K. Law, and D. M. Young, for Appellant.

F. G. Ostrander, J. J. Griffin, and Henry Brickley, for Respondent.

SHAW, J.—This is an appeal from an order annulling and revoking the probate of a document admitted to probate as the last will of William Jones, deceased. The contest was initiated within one year after probate, by and on behalf of Lester William Jones, who alleges that he is an illegitimate son of the testator and that he was duly adopted as legitimate by the testator in the manner specified in section 230 of the Civil Code. The grounds of the contest were that at the time of the execution of the will the decedent was not of sound mind and that the execution of the will was procured by undue influence.

The cause was tried by a jury and a verdict was returned in favor of the contestant on both of the alleged grounds.

It is earnestly contended that the evidence is insufficient to support the verdict on either ground. There was no direct evidence of undue influence, but there was proof of circumstances from which the jury might with reason have inferred that the beneficiary of the will and certain other persons conspired to procure the execution of the will, and that, taking advantage of the weak condition of the testator in his last sickness, they prevailed upon him to make this will, contrary to his real wishes and intentions. On the issue of insanity there was much direct evidence both for and against the ver-

dict.   At the very time of making the will, the persons pres-
ent were those who, it is claimed, exercised the undue in-
fluence.   They all, without exception, testified that the testator
was then of sound and disposing mind.   There was no direct
evidence to the contrary, as to his condition at that time.   It
is argued that for this reason the verdict on this issue is con-
trary to the evidence.   There was, however, substantial evi-
dence on which to found two distinct theories, upon either of
which the jury might have reached the conclusion that his
unsoundness of mind existed at the time of the making of the
will and rendered him incompetent to execute it.   The evi-
dence tended to show that the testator was afflicted with a
gradual increasing dementia or insanity, which, though not·
always manifest, was ever present affecting his mental capac-
ity, particularly in his later life and during his last illness
when he made the will.   Other evidence tended to show that
his insanity was of that form which manifests itself by fre-
quent attacks, with fairly lucid intervals between.   With
respect to this, the appellant insists that the only evidence
relating to his condition when he was making his will was to
the effect that he was then in a lucid interval.   But there was
evidence that both before and after he made the will, and
when he was apparently lucid, his persistent purpose was to
provide for this child and that he knew that it was his own
child and openly acknowledged it as such.   The will did not
even mention the child, and during the time it was under con-
sideration, according to the testimony introduced by appel-
lant, he denied that he was the father of the child.   From
this evidence, the jury might have believed that the time when
he was making the will was not one of his lucid intervals, but
was one of the periods when his mind was clouded by de-
lusions concerning the paternity of his child.   In this con-
dition of the case upon the evidence, the decision of the jury
cannot be disturbed upon the ground that it is contrary to
the evidence.

The most interesting question presented is that of the adop-
tion of the contestant, Lester William Jones, as a legitimate
son of the deceased.   Section 230 of the Civil Code is as fol-
lows:

"The father of an illegitimate child, by publicly acknowl-
edging it as his own, receiving it as such, with the consent

of his wife, if he is married, into his family, and otherwise treating it as if it were a legitmate child thereby adopts it as such; and such child is thereupon deemed for all purposes legitimate from the time of its birth.''

The fact that Lester William Jones was the illegitimate son of William Jones was clearly proven by uncontradicted evidence. It was also shown that the decedent acknowledged Lester to be his own child many times, willingly and on all occasions, as the father of a legitimate child would naturally do. Without stating details, it is sufficient to say that these requirements of the code were fully met by the proof. (*Estate of Gird,* 157 Cal. 542, [137 Am. St. Rep. 531, 108 Pac. 499] ; *Blythe* v. *Ayres,* 96 Cal. 577, 592, [19 L. R. A. 40, 31 Pac. 915] ; *In re Jessup,* 81 Cal. 425, [6 L. R. A. 594, 21 Pac. 976, 22 Pac. 742].) The only doubt is upon the question whether his treatment of the child constituted a sufficient ''receiving it as such (his own) . . . into his family, and otherwise treating it as if it were a legitimate child,'' to comply with the true intent of the code provision. The facts and circumstances bearing upon this point are as follows:

For many years prior to his death the decedent resided on his cattle ranch in the western part of Merced County, in the mountains near the line of San Benito County. In 1897 the mother of this boy, then known as Laura Roberts, went to this ranch with him and there lived and cohabited with him until November, 1902. She testified that they expected to be married but that they just lived together from year to year without having any ceremony performed. Two children were born to them during this time, Corinne, a daughter, born in 1898, and William, a son, born in 1900, but who died about a year thereafter. In May, 1902, she became pregnant with the boy here in question. In November, 1902, on account of the strange and rather violent conduct of Jones toward her, she left the ranch, taking the little girl with her. She never afterward lived with Jones. The boy, Lester, was born on February 27, 1903, at the house of her sister. In July, 1903, she married William W. Baker and she has lived with him ever since that time. From the birth of this boy, while Jones lived, he looked after the boy, frequently visited him at the home of the mother, acknowledged him as his son, gave her money for his support and bought clothing for him at fre-

quent intervals. Some two or three years after her marriage
with Baker she had a child by him. The girl Corrine died
in the summer of 1908. Soon after her death Lester had
scarlet fever and it left him in somewhat delicate health.
About the time of his recovery, Jones upon one of his visits
to the boy, seeing that his health was not good, invited or
requested the mother to come with her family to his ranch in
the mountains and remain there with him for awhile to benefit
the boy's health. She acceded to this and thereupon she and
her husband, with the boy Lester, and the child of Baker,
went to said mountain ranch and remained there for two
months. Jones at that time was living in a four room house
on the ranch. In this house he had theretofore lived, usually
alone, but sometimes with a man who assisted him in the
ranch work. At the time of this visit an old man was living
with him doing chores about the place. During that visit
of two months Jones, Mr. and Mrs. Baker, and the two child-
ren lived in the four-room house and Mrs. Baker cooked for
them all. Jones played with Lester, spoke of him as his boy,
slept with him for the greater part of the time, took him to
the house of his half-brother Lee, living near, and there spoke
of him as "my boy." The boy called him "papa," and Jones
apparently took as much interest in the boy as a parent
would ordinarily take in a legitimate child. The boy grew
better and as soon as his health was established, the mother
and Baker left the ranch, taking the child with them. Neither
before or afterward was the boy on the ranch or present at
his father's home, and in no other manner, nor at any other
time did Jones receive the child into his family assuming that
the establishment was a "family," within the meaning of
section 230.

The meaning and effect of section 230, so far as it requires
that the father of an illegitimate child must, in order to
adopt it as legitimate, receive it as his own into his family,
have been frequently considered by this court. We are satis-
fied that, under these decisions, William Jones had a "fam-
ily," within the purview of the provision, into which he
could have received this child. In *Estate of Jessup,* 81 Cal.
408, [6 L. R. A. 594, 21 Pac. 976, 22 Pac. 742], the prevailing
opinion does not satisfactorily determine whether in order to
come within the section a man must have a family in the

CLXVI Cal.—8

strict sense of a collective body of persons living together as a household, or whether it is sufficient that he have a family in the sense of having brothers and sisters, with whom he is not living but with whom he associates (81 Cal. 424, 434). The decision there was that the child had not been received into the family, whether the word was taken in the one sense or the other. The discussion of the true definition of the word "family" was, therefore, not an important part of the opinion. The court was unanimous to the effect that it was not necessary that he should be married in order to have a family within the meaning of the provision. In *Blythe* v. *Ayres,* 96 Cal. 577, [19 L. R. A. 40, 31 Pac. 915], it seems to have been considered that Blythe had no family in either sense of the word. The child was there declared to be an heir because Blythe had made a written acknowledgment that he was her father as provided in section 1387 of the Civil Code. In *Garner* v. *Judd,* 136 Cal. 394, [68 Pac. 1026], the court said that a man who has a dwelling in which he makes his home, living with a woman to whom he is not married, but whom he holds out to the world as his wife, has a family into which he must receive an illegitimate child in order to adopt it under section 230. In *Estate of De Laveaga,* 142 Cal. 169, [75 Pac. 794], the court held squarely that a man cannot adopt a child under this section unless he has a "family, or at least a home, into which he can receive it." In that case the father had parents, brothers, and sisters living, with whom he was on friendly terms, but he did not live with them. He also had a place of abode, but he never received the child therein or took it among his kindred. In *Estate of Gird,* 157 Cal. 542, [137 Am. St. Rep. 131, 108 Pac. 499], the father was unmarried, but lived on his ranch in a dwelling-house occupied by a woman as his housekeeper, assisted by the mother of the child. His relations with the mother were clandestine. It was held that this household constituted a family within the meaning of this section.

The facts in the case at bar on this point are not essentially different from those in *Estate of Gird,* 157 Cal. 542, [137 Am. St. Rep. 131, 108 Pac. 499]. Jones had a residence and dwelling-house which was his fixed place of abode. Although, for long periods of time, he lived in the house alone, it was nevertheless his home. Clearly, if he had taken this child

there and they had lived there as father and son, the two would have constituted a family sufficient to satisfy this statute. We are of the opinion that the section requires nothing more in this respect than that the father should have a fixed habitation, constituting his home, which, if he takes the child to live with him there, would be the home of such family, although the family may then consist of but the two persons.

The residence of the child for two months with Jones in his own house was, in our opinion, a reception into his family as his own child, and complied with the provision under consideration. Jones's condition in life must be considered in this connection. If the child had been born in wedlock and the mother had died, and Jones could not have conveniently kept him on the ranch without having some other person there to take care of him while he was at work, it would have been reasonable for him to have the boy kept elsewhere during his tender years by a competent person. In such a case, if the child's health was bad and a sojourn for a time at the ranch would have improved it, the natural and reasonable course toward a legitimate child would be to have the person in charge of it take it to the ranch and remain there with it while it was recuperating. Mrs. Baker, in all respects except in her ideas as to the marital relation, appears to have been a fit person to care for a small child. Both she and Jones appear to have considered the separation as in the nature of a divorce and no enmity or ill-feeling arose between them on account of it. The visit of the boy to the ranch with his mother's family was, under the circumstances, very like what would have been expected in the case of a legitimate infant child necessarily living away from his father's home in the family of some other person. Jones openly received the boy into his home as his own child. It was his family into which the boy came. Although the boy was at the same time a member of his mother's family, it was also, while living in this manner in his father's home, a member of his father's family. Where the father and mother of a child have been divorced, or have not been married, and live apart and have separate and distinct families, the child must often have a dual family relation as a member of each family. If under such conditions the two families should come together as one, it would be during that period of time as much a member of the

father's family as of the mother's, and this would make a reception into his family sufficient to carry out the purpose and object of the section we are considering. There was, therefore, a substantial compliance with the section in this particular.

The facts we have related are sufficient to show that Jones, before and after this visit, was "otherwise treating it as if it were a legitimate child," within the meaning of the section. He claimed paternity, visited the child often, contributed continuously to its support, had a parental affection for it, and his conduct and feelings toward the child were substantially the same as those of a father toward a legitimate child under similar circumstances. Our conclusion is that the evidence of adoption under section 230 is sufficient to support the finding.

Upon the trial, Lee Jones, a half-brother of testator, was a witness for the contestant. He testified that he had a conversation with the testator with reference to his property two days before his death and twenty-six days after the execution of the will. He was then asked to relate that conversation. Objection was made on the ground that it was incompetent and immaterial. The court then said to contestant's counsel, "What is the purpose of this?" Counsel answered that the purpose was to show his mental condition at the time he made the will, and also that it was admissible to show that undue influence had been exercised upon him at the time he made the will. The court thereupon overruled the objection. Witness then answered as follows:

"When I went in to see him I said, 'Bill, how are you?' He said, 'I am awful sick, Lee.' I says, 'I suppose you have everything fixed up Bill, the way you want it,' and he said, 'No, I haven't, Lee. I was talked into making the will and cutting off my boy without a cent. I know it ain't right; I want to give my boy the property. Ain't that right, Lee?' I said, 'Yes, if you are sure it was your child, that is right. Are you sure, Bill, that is your child?' He said, 'Yes, I am sure.' I said, 'If that is the way you feel about it, that is right. You are a very sick man and you should attend to it.' He said, 'Let this go for a day or two days and I will fix it up.'"

It is obvious that the contestant did not offer this evidence to prove that the testator was of unsound mind at the time

the conversation took place. His theory was that he was of sound mind at that time, but that the purpose and feeling he exhibited then indicated that he must have been insane at the time the will was made four weeks before, inasmuch as the will gave nothing at all to the boy, and did not even mention him. So much of the conversation as simply disclosed his feelings and desires with respect to the boy would be admissible on the issue of insanity. For similar reasons it would tend to raise an inference, if at the time of the conversation he was free from any influence, that his real wish and purpose was to give his property to the boy, and that the will giving it to another was probably the product of undue influence. Other parts of it were competent as proof of the paternity of the child and of his acknowledgment thereof, as going to show the adoption. But the evidence was avowedly offered as a statement by the testator that the will had been procured by undue influence and that it was the result of undue influence upon him. It was not a part of *res gestae* of the execution of the will. The declaration "I was talked into making the will and cutting my boy off without a cent" was a narrative or relation by the testator of a past event, an express declaration that undue influence had been exercised upon him whereby he was caused to make this will. We have so often declared that such evidence is hearsay and inadmissible for that purpose that it is unnecessary now to discuss the subject. We refer to the following cases where the doctrine is elaborately treated and stated: *Estate of Calkins,* 112 Cal. 302, [44 Pac. 577]; *Estate of Arnold,* 147 Cal. 593, [82 Pac. 252]; *Estate of Snowball,* 157 Cal. 308, [107 Pac. 598]; *Estate of Ricks,* 160 Cal. 466, [117 Pac. 532]; *Estate of Ricks,* 160 Cal. 485, [117 Pac. 539]; *Estate of Lavinburg,* 161 Cal. 546, [119 Pac. 915]; *Estate of Gleason,* 164 Cal. 760, [130 Pac. 872].

This declaration of the testator would be very persuasive evidence to a jury and its admission must be presumed to have been prejudicial to the appellant on the issue of undue influence. If no other ground of contest had been presented, it would be necessary to reverse the case for this error. But it was also alleged that the testator was not of sound mind when he executed the will. Separate verdicts were returned on each of the issues. Upon the latter issue, as we have said,

the evidence, while conflicting, was sufficient to support the verdict that he was of unsound mind at the time the will was made. This being the case, the verdict is sufficient to support the judgment without regard to the decision as to undue influence. Errors, though substantial, in regard to the trial of that issue, must for this reason be considered as harmless so far as the judgment is concerned. (*Lowe* v. *San Francisco etc. Ry. Co.*, 154 Cal. 578, [98 Pac. 678].) For this reason we refuse to reverse the judgment because of this ruling.

After the trial had proceeded five days, the appellant discovered that two jurors serving on the jury were also then members of the grand jury of the county, and he thereupon challenged them as jurors on that ground and asked to have the challenge allowed. Under the code they were clearly incompetent. (Code Civ. Proc., sec. 602, subd. 1; sec. 199, subd 4.) If the challenge had been made at the time the jury was impaneled it would doubtless have been allowed. But they were impaneled as grand jurors before the impanelment of this trial jury. The records of the court, easily accessible to the appellant, showed that fact. He might also have learned it by an examination of the jurors on their *voir dire,* but he neglected to do so. No reason was offered for his failure to ascertain the fact before the jury was sworn. Under the circumstances, the court did not abuse its discretion in holding that the objection was too late and must be deemed to have been waived. (*People* v. *Sanford,* 43 Cal. 31; *People* v. *Chung Lit,* 17 Cal. 320; *People* v. *Mortier,* 58 Cal. 266.)

A number of alleged errors concerning the admission and rejection of evidence are referred to in the brief but not argued. We have examined them and find that none of them is of sufficient importance to justify further notice.

The order appealed from is affirmed.

Angellotti, J., and Sloss, J., concurred.

Hearing in Bank denied.

Melvin, J., dissented from the order denying a hearing in Bank, and filed the following opinion on September 29, 1913:

MELVIN, J.—I dissent from the order denying the petition for a hearing in Bank. In my opinion the evidence totally fails to show any such unsoundness of mind as would operate upon the testamentary capacity of the decedent. There was evidence of many eccentricities and peculiarities, including sudden outbursts of temper, but there was not one word of testimony indicating that up to the time of his last illness William Jones was not able to attend to all of his business matters in a normal way. There was no direct evidence contradicting the witnesses to the will and the statements of the attending physician and the nurse that at the time of the making of his will he was of sound and disposing mind. Nor was there anything related in the testimony regarding his condition in the hospital or before he went there which would show that condition of general insanity which must have or even *might* have deprived him of the power of making a valid will. The decision in this case virtually overrules such cases as *In re Redfield,* 116 Cal. 641, [48 Pac. 794], and *In re Wilson,* 117 Cal. 264, [49 Pac. 172, 711], which hold that the evidence necessary to overthrow, on the ground of mental unsoundness, a will solemnly executed shall disclose such mental obliquity as must have operated upon the testamentary act itself.

I am also unable to agree with the opinion of Mr. Justice Shaw that the child of William Jones was adopted in contemplation of the provisions of section 230 of the Civil Code. Even if a man living alone in a permanent abode has a "family" sufficient for the purposes of the statute, the facts of this case absolutely fail, in my opinion, to show that William Jones received his illegitimate son into such family for the purposes of adoption or in any manner to bring the boy's visit within the purview of the statute. The child accompanied its mother and her husband and a younger child born to her after her marriage to Baker on a visit of two months to the home of Jones. At that time and at *all* times the boy was a member of his *mother's* family. True, it was stated by her that the child occupied a bed with Jones during the time they were the latter's guests, but the purpose of the visit was not to receive the child into the family of Jones, but to give him the benefit of the climate, and when his health improved the visit was terminated on the mother's suggestion.

The receiving of a child into a family must be such a reception as would be accorded a *legitimate child,* because the statute provides that in addition to such "receiving" the father must *otherwise treat* the child *"as if it were a legitimate child."* Was there anything in the brief visit to the Jones Ranch by Mrs. Baker and her family different from a trip to a health resort which they might have taken at the invitation of Jones? If there was I fail to see it. The reception of the child as a visitor with his mother and her husband and her baby was, it seems to me, just the reverse of treating the boy as a legitimate child. The presence of the other members of the Baker family could indicate nothing more forcibly, I think, than the recognition by Jones and by them of the transient character of the sojourn. Naturally, if he intended to take the boy into his family and to treat him "as if he were a legitimate child," Jones would not wish to be perpetually burdened with Mrs. Baker's other family. In the opinion the *Estate of Gird,* 157 Cal. 538, [137 Am. St. Rep. 131, 108 Pac. 499], is cited in support of the views expressed, but in that case the children were born and reared on the Gird property and grew up under the exact conditions which would have surrounded legitimate progeny. They were not mere visitors who came and went with the mother. It seems to me that the department opinion flies in the face of the statute. If, after the brief visit of the Baker family to his ranch, Jones had sought to obtain custody of the child on the ground that he had adopted his illegitimate offspring with the mother's consent, under the provisions of section 230 of the Civil Code, would any court have deprived the mother of her son if she had contested the application? I think not. Yet we must maintain that view in order to support the holding that a proceeding so solemn and important as adoption was intended and accomplished by Jones. In any view of the questions involved I think they are sufficiently important to merit examination by the whole court.