[S. F. No. 8995. Department One.—February 24, 1920.]

In the Matter of the Estate of DAVID JENNINGS BAIRD, Deceased. DAVID JENNINGS BAIRD, Respondent. v. VERONICA C. BAIRD, Appellant.

[1] ADOPTION—ILLEGITIMATE CHILD—ESSENTIALS.—In view of section 230 of the Civil Code, four things are essential to the adoption of an illegitimate child by its father, first, he shall be its natural father, second, he shall have publicly acknowledged himself to be the father, third, he shall have received the child into his family, and fourth, he shall have otherwise treated it as his legitimate child.

[2] ID.—RECEPTION OF ILLEGITIMATE CHILD INTO FAMILY—TEST.—It is the attitude of the father toward and his conduct in respect to his illegitimate child, and not the· character of his relationship with the mother, which is the true test in determining whether the child was received into the family of the father.

[3] ID.—CLANDESTINE FAMILY OF UNMARRIED MAN—MAINTENANCE OF ILLEGITIMATE CHILD—INSUFFICIENT RECEPTION INTO FAMILY.— Where the unmarried father of an illegitimate child lives in the same community and maintains constant relations with his own legitimate family, and at the same time, under an assumed name, maintains the illegitimate child clandestinely in another home with

---

1. What amounts to recognition within statutes affecting the status or rights of illegitimates, note, L. R. A. 1916E, 659.

its mother, with whom he lives in illicit relations a great part of his time, he is not receiving the child as his own "into his family," within the meaning of section 230 of the Civil Code.

[4] ID.—CONCEALMENT OF EXISTENCE OF ILLEGITIMATE CHILD FROM LEGITIMATE RELATIVES—INSUFFICIENT TREATMENT OF CHILD AS LEGITIMATE.—Where the father of an illegitimate child has members of his own family living in the same community, with whom he is in almost constant association and maintains cordial relations, he does not treat the child as if it were a legitimate child, if he conceals its existence from such members of his real family, never has them visit the child or has the child visit them, or in any other manner acts toward the child with regard to his own legitimate relatives as any father reasonably would if he intended to adopt the child as his own and treat it as his legitimate child.

APPEAL from a judgment and decree of partial distribution of the Superior Court of the City and County of San Francisco. Geo. A. Sturtevant, Judge. Reversed.

The facts are stated in the opinion of the court.

Mastick & Partridge and Karl C. Partridge for Appellant.

Charles M. Fickert and Edward A. Cunha for Respondent.

LAWLOR, J.—This is an appeal by Veronica C. Baird, as executrix of the last will and testament of David Jennings Baird, deceased, from a judgment and from a decree of partial distribution of the superior court in and for the city and county of San Francisco. The petitioner, by the guardian of his person and estate, Lydia Margaret Valencia, applied for a partial distribution of the said estate on the ground that he is the illegitimate son of the decedent and said Lydia M. Valencia, and that he had been adopted by the decedent in the manner provided by section 230 of the Civil Code, that is to say, that the decedent had publicly acknowledged the petitioner as his own child, received him as such into his family, and had otherwise treated him as if he were a legitimate child.

On a former hearing a judgment denying the petition was made and entered by the superior court, sitting without a jury, from which an appeal was taken to this court. The

judgment was reversed and the cause remanded for a new trial (*Estate of Baird,* 173 Cal. 617, [160 Pac. 1078]), on the ground that the superior court erred in refusing the demand of the petitioner for a trial by jury as contemplated by sections 1312 and 1716 of the Code of Civil Procedure. A trial was thereafter had before a jury, which resulted in a verdict in favor of the petitioner, in approval of which the trial court made findings of fact and conclusions of law, entered judgment in favor of petitioner, and made a decree of partial distribution on June 14, 1918, distributing the entire estate to him, namely, certain real property situate in Contra Costa County, ten thousand dollars in money, and 221 shares of the capital stock of the Sausalito Land and Ferry Company.

It is alleged in the petition that Lydia M. Valencia is the guardian of the estate and of the person of petitioner; that David Jennings Baird, the decedent, died on November 25, 1908, leaving an estate of the appraised value of $98,666.38, consisting of real and personal property; that the decedent left a last will and testament dated July 30, 1903, by which he bequeathed and devised his entire property to his mother, Veronica C. Baird, and to two brothers and to two half-brothers; that in said will the decedent appointed his mother, the said Veronica C. Baird, and I. I. Brown, executrix and executor, respectively; that petitioner is the child and son of the decedent and Lydia M. Valencia, and that neither the decedent nor Lydia M. Valencia was ever married; that petitioner was born in San Francisco on December 7, 1906; that at the time of and for more than one year preceding the birth of petitioner, the decedent and Lydia M. Valencia lived and cohabited together in San Francisco without having been married, and that during all of that time the decedent had a family consisting of himself and Miss Valencia; that from the time of the birth of petitioner and up to the death of the decedent, he maintained a home and family in San Francisco, consisting of the decedent, Miss Valencia, and petitioner, and of no one else, and that from and after the birth of petitioner and up to the death of the decedent, he publicly acknowledged himself to be the father of the child to numerous and various persons by open and public declarations, statements, admissions and acts; that upon the birth of petitioner the decedent received

him into his family, constituted as aforesaid, as his own child, and that the petitioner remained and was by the decedent kept continuously and uninterruptedly in the said family as a part of the same and a member thereof, in the care and custody and control of the decedent, as the father of petitioner, up to the decedent's death, ''and did otherwise so treat the said child as if it were a legitimate child by the exercise of those acts, declarations, and conduct which are usual by the father of a legitimate child and a legitimate born child with respect to such a child and the ordinary and usual treatment of such a child''; that the decedent adopted petitioner as his own child; that the said will of decedent was made before petitioner was born, and that it left petitioner unprovided for by any settlement; that the decedent in no way provided for petitioner in said will, and that by reason thereof petitioner is entitled to the whole of decedent's property; and that the estate of decedent is but little indebted, and that the share of petitioner may be allowed to him without loss to the creditors of the estate.

The devisees and legatees of the decedent opposed the application for partial distribution. In their answer they denied all the material allegations of the petition as to the paternity and the adoption of the child, and alleged that the family of the decedent consisted of himself, his mother, sister, and brothers, into which family the child was never received; and that he indignantly denied in terms of opprobrium that the child was his and continuously concealed its existence from them.

A mass of evidence was introduced in support of and against the claim of adoption, but in the consideration of the question here we shall assume that upon the evidence, the verdict of the jury and the findings of the court, it was established that the decedent was the natural father of petitioner, and that he publicly acknowledged him as his own child. We will therefore discuss the evidence with special reference to the remaining propositions—whether petitioner was received into the family of the decedent, and by him otherwise treated as a legitimate child, and view it in the light most favorable to petitioner.

Beginning in the year 1902, at which time they set up housekeeping, and ending with the death of the decedent, he and Miss Valencia, though unmarried, lived together in

various places in San Francisco under the assumed name of Mr. and Mrs. David Tyler. The petitioner was born in the St. Helen Apartments, one of their abodes, on December 7, 1906. Miss Valencia testified that for more than a year preceding this event and until the decedent died, they lived together as man and wife, accomplishing all the relations of man and wife, and that she had no relations whatever with any other man, and that she and the decedent constituted a family at that time of which he was the head, and that petitioner was received into such family. The petitioner, the mother, and the decedent continued to live at the St. Helen Apartments until April, 1907, when they moved to the Octavia Apartments, where they remained for six months, and then went into a house at 230 I Street. They were living in the latter place when the decedent died on November 25, 1908. The attending physician at the confinement of Miss Valencia testified that he was engaged by decedent considerably in advance of the birth of petitioner; that the decedent directed him to secure a nurse, and that the decedent paid all expenses.

According to the evidence, from the beginning of their housekeeping the decedent employed the servants and paid all the expenses of the household, and he would sometimes give orders to servants and to tradesmen. The bills for the household and other expenses were generally made out and paid in the name of "Tyler," the real identity of the members of the household, however, being known to some of those with whom they had dealings, also to many of their mutual acquaintances and friends. Miss Valencia was frequently introduced as the wife of the decedent by the name of "Tyler" and on occasions as "Mrs. Baird." According to a number of witnesses, he invited them in to see his "wife and baby." There is much testimony to the effect that the decedent habitually caressed, fondled, took care of, attended upon, and played with the child, gave directions to the servants concerning him, bathed him, and otherwise manifested a deep interest in its welfare. During the pregnancy of the mother the decedent expressed the hope that the child would be a boy. He called him "my boy," "papsy's boy," and "Davey," bought him toys, referred to himself as "pappy" and his "papsy," and "seemed to be proud of him and think a whole lot of him." He asked different persons how they liked the baby, if it looked like

him, and seemed pleased when told that they resembled each other. On one occasion he remarked that some day petitioner would be president of the Baird estate. The decedent frequently discussed petitioner with neighbors, visitors, chauffeurs, cafe proprietors, bartenders, and others. He sometimes wheeled the child in a buggy in the neighborhood and in public parks, occasionally accompanied by the mother and the nurse, when, according to one of the servants, people would salute the decedent as "Baird" or "Dave." He also took the child on automobile trips and discussed plans for his education and for his future generally. The decedent had numerous pictures taken of the baby, some of which he had framed. Photographs of the child were found in the decedent's room at the Fairmont Hotel after his death. He and Miss Valencia were photographed together. He sent her cards and other communications while he·was absent from San Francisco. A number of the decedent's personal effects, pictures, uniforms, trinkets, and souvenirs were found in Miss Valencia's possession after his death. He kept part of his wardrobe and other personal belongings in their various abodes, and sometimes when he had social engagements, he would have her send his things to the hotel. When they went to the Alexander Apartments to live in the early part of 1906, he registered, according to the proprietress, under the name of "Baird." A "wedding ring" engraved "Dave to Dodie, 1907," was found·in the decedent's safe deposit box following his demise. There is much evidence as to the proportion of his time that decedent spent with the mother and the child, how frequently the baby and the mother had their meals in cafes when he was not present, and how often he took his meals with them. Testimony was introduced to the effect that Miles T. Baird, a brother of the decedent, sometimes came to the apartment to see him after petitioner was born, that he brought the child toys and fondled him, and that on one occasion, at the Octavia Apartments, the decedent said to his brother, referring to petitioner: "Miles, he is a dandy. He beats your baby all hollow."

After the birth of petitioner, the decedent agreed to purchase the house at 230 I Street by installment payments, directing that the deed be made out in the name

of "Lydia M. Valencia," and which house was sold after he died, because of default in the payments. He paid for the furnishings in this house, which were also billed and insured in her name. The household telephone was in the name of "Mrs. D. V. Tyler." This was also true of the accounts for water, gas, and electricity. Miss Valencia testified that the decedent informed her on different occasions that he kept a room in a hotel, and it is not claimed on behalf of petitioner that, with the exception of Miles T. Baird, any relative of the decedent ever saw the child, or that he discussed it with them or any of them, or that it was ever received or introduced into the Baird family, or that any member thereof, save Miles T. Baird, ever visited or had any form of communication with the mother of the child. Benjamin H. Baird, a half-brother of decedent, testifying on behalf of the estate, stated that in the month of May, 1908, he asked decedent if he was the father of petitioner and that he denied that he was.

The evidence on behalf of the estate shows that the decedent was about 28 years of age at the time of his death; that the estate left by his father was incorporated as the "Baird Estate," and that the decedent was the president thereof; that his relatives consisted of his mother, Veronica C. Baird, who was a widow, a sister, two brothers, John Rush Baird and Miles T. Baird, and two half-brothers, Benjamin H. Baird and Thomas R. Baird; that his brother, John Rush Baird, who is mentioned in the decedent's last will, died in December, 1905; that for a portion of the time from January, 1906, until his death the remaining relatives of the decedent were in San Francisco; that with the exception of Benjamin H. Baird and Miles T. Baird, as already noted, the decedent never mentioned the existence of the child to any of them; that after the earthquake and fire he had a room in a lodging-house where his half-brothers lived, and that thereafter until he died he kept a room either in the Little St. Francis Hotel, the Palace Hotel, or the Fairmont Hotel; that part of that period his mother lived in the same hotel with him; many witnesses were examined and city directories and telephone directories, postoffice and business records were produced to prove the decedent's residence addresses, which included the hotels and lodging-house already referred to and did

not include any of the abodes where he kept the mother
and the child; that his sister was in San Francisco part of
the time from January, 1906, until she moved to New York;
that, according to the testimony of Benjamin H. Baird, the
only members of the Baird family who were in California
from April, 1907, to January, 1908, were the decedent and
Thomas R. Baird, and that 'Miles T. Baird left the state
for Australia in April, 1907, and did not return until after
the decedent passed away; that with the exception of Miles
T. Baird all of the remaining relatives of the decedent
gave testimony at the trial, and, excepting Benjamin H.
Baird, they all denied that the child had ever been men-
tioned by the decedent in their presence or in the presence
of any of them, and, including Benjamin H. Baird, they
all denied that the child was ever introduced into the Baird
family, or that any of them ever saw him, that they ever
visited any of the places where petitioner lived with his
mother, or that any communication ever passed between
them and the mother and the child; that the decedent never
mentioned petitioner to any of his friends, business associ-
ates, or to any of the persons with whom he had dealings
in connection with the Baird estate; that when his mother
would be in San Francisco, following her annual trips to
Europe, decedent was in the habit of going to her room at
the hotel, dining with her and often remaining with her
until 10 or 11 o'clock at night; that his mother returned
from Europe in May, 1908, and remained in San Francisco
until his death; that the decedent was on terms of cordial
and affectionate intimacy with his relatives; that when they
were in San Francisco he was in constant association with
them.

In this summary of the evidence we have not attempted
to cover every phase thereof, nor the numerous inquiries
on cross-examination, nor the many apparent contradictions
and inconsistencies as shown by the voluminous record
before us, for the reason, as already indicated, that we
shall resolve every question of fact in favor of petitioner.
It may, however, contribute to a more complete under-
standing of the evidence to mention that the decedent in his
relations with the mother of the child led a life of reckless
dissipation, being habitually under the influence of intoxi-
cants, and otherwise showing great demoralization; that

for the most part the persons who figured prominently in their illicit relationship (excluding neighbors and those with whom they had business dealings), and upon whose testimony the case of petitioner very greatly depends, came into the life of the decedent through such relationship, some of them of loose morals and just the kind of characters it might be expected would be their mutual companions, associates, and friends: There are frequent references to lively automobile parties, the bill in one month for automobile hire amounting to over six hundred dollars, and, according to the evidence, only one man ever sharing with the decedent the expense of such entertainment; and to trips to the beach, to roadhouses, to cafes and the like, on occasions the entire night being given over to that kind of diversion.

The findings of the court are to the effect that, at the time of and for more than one year immediately preceding the birth of petitioner, the decedent and Lydia M. Valencia continuously lived and cohabited together in the city and county of San Francisco without having been married, and that during all of that time the decedent had and maintained a family consisting of himself and Lydia M. Valencia, together with domestic servants, and that while so living together the petitioner was born as a result thereof; that while so maintaining a family, petitioner was born into the family and household of decedent at the St. Helen Apartments, and that from the time of petitioner's birth until about April 1, 1907, the decedent maintained in the St. Helen Apartments a family and household, consisting of himself, the petitioner, and Lydia M. Valencia, and household servants; that during said period of residence at the St. Helen Apartments the decedent received petitioner into his family as his own child, and that petitioner resided with the decedent at the St. Helen Apartments as a part and member of decedent's family, sleeping in the same apartments and eating at the same table, and that during said period at the St. Helen Apartments, petitioner was fed, clothed, and provided with the necessaries of life, was cared for and caressed by decedent, and was treated by him as a father would treat his own legitimate child; that at the Octavia Apartments petitioner was fed, clothed, and provided with the necessary comforts of life, cared for and

caressed and was treated by decedent as a father would treat his legitimate child; that decedent moved from the Octavia Apartments to the house at 230 I Street, where he resided until his death, "and maintained in said dwelling . . . a household and family consisting of himself, petitioner, and said Lydia M. Valencia and household servants"; and "that . . . during the minority of the petitioner, the said David J. Baird received the petitioner into his family as his own child, and otherwise treated the petitioner as if petitioner were his legitimate child." In the light of the instructions it is to be implied that the jury made similar findings.

Section 230 of the Civil Code reads: "The father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such; and such child is thereupon deemed for all purposes legitimate from the time of its birth. The foregoing provisions of this chapter do not apply to such an adoption."

[1] Four things are therefore essential to the adoption of an illegitimate child by its father: (1) He shall be its natural father. (2) He shall have publicly acknowledged himself to be the father. (3) He shall have received the child into his family. (4) He shall have otherwise treated it as his legitimate child.

Did the decedent receive petitioner into his family? Referring to the word "family" as it appears in section 230 of the Civil Code, it was declared in *Estate of Gird,* 157 Cal. 544, [137 Am. St. Rep. 131, 108 Pac. 499], Chief Justice Angellotti writing the opinion of the court: "In *Estate of Bennett,* 134 Cal. 323, [66 Pac. 371], this court said: 'The meaning which is to be given to the word is to be determined by the context, and also from a consideration of the subject matter to which it relates. Every case must depend upon its particular circumstances. Mr. Jarman says (Jarman on Wills, *941): "Family" is not a technical word, and is of flexible meaning.' "

It was declared in *Estate of De Laveaga,* 142 Cal. 169, [75 Pac. 790], that the father of an illegitimate child cannot adopt it unless he has a family, or at least a home into which he must receive the child.

The respondent has cited and discussed a number of authorities, including *Estate of Gird, supra,* and *Estate of Jones,* 166 Cal. 108, [135 Pac. 288], to which we may add the recent case of *Estate of McNamara,* 181 Cal. 82, [183 Pac. 552], in support of the contention that the decedent was the head of a family composed of himself and the mother of the child, and that at petitioner's birth he was received into such family by the decedent, but the facts in those cases differ so widely from those in the case at bar that we do not think it is necessary to discuss them, for in no case has it been held that a family constituted as this "family" was, as shown by the uncontroverted evidence in the case, would come within the meaning of the statute. If this was a family, it was a clandestine family, using the word "clandestine" to describe the character of the family rather than the relationship that existed between the father and the mother of the child. Thus, in *Estate of Gird, supra,* the court held in favor of the adoption where the relations between the father and the mother were clandestine, and the child and the mother went under the name of her husband. **[2]** It is the attitude of the father toward and his conduct in respect to the child, and not the character of his relationship with the mother, which is the true test in determining whether the child was received into the family of the father. It would be a violation of the letter and spirit of the statute to hold that "the father of an illegitimate child" has received it "into his family," where the existence of the "family" rests upon concealment and dissimulation well calculated to keep from his own relatives, who are living in the same community and with whom he is on terms of intimacy, all knowledge either of the child or of "his family."

In this case the couple masqueraded as man and wife under a fictitious name assumed by the father and mother and given to the child in order to keep the decedent's family in ignorance of the meretricious relationship and of the child. As we have seen, the decedent was on cordial and intimate terms with the members of the Baird family. He constantly canvassed the affairs of the Baird estate with them, had other interests in common with them, corresponded with his mother and sister, arranged for the schooling of his half-brothers, and one year made a trip to New

York to meet his mother on her return from Europe so that he might journey to San Francisco with her and other members of the family. In short, the relations between the decedent and his relatives clearly appear to be such, considering their respective modes of living, as usually obtain between a bachelor son and his relatives with whom he is on terms of cordial and affectionate intimacy, and plainly suggest that the motive for his course of conduct towards petitioner was to spare the Baird family humiliation. We think this is true in spite of the testimony of several of respondent's witnesses, from which it might be inferred that the decedent seized every opportunity to proclaim his shame, going so far, according to the testimony of the attending physician, as to name the child "David Jennings Baird." This witness, who had known Miss Valencia and the decedent for several years before petitioner was born, stated that he obtained the data for the birth certificate from the decedent, who was reluctant to give the information because "he wanted to keep it from his mother." It is worthy of mention that the birth certificate was not filed until February 14, 1907—more than two months after the birth of petitioner. This physician also stated that when he sent bills for his services to the decedent to the apartment or to the house he used the name "Tyler," and when to the Palace Hotel or the Fairmont Hotel, the name of "Baird." [3] The evidence leads us to the conclusion that where the unmarried father of an illegitimate child lives in the same community and maintains constant relations with his own legitimate family, and at the same time, under an assumed name, maintains the illegitimate child clandestinely in another home with its mother, with whom he lives in illicit relations a great part of his time, he is not receiving the child as his own "into his family," within the meaning of section 230 of the Civil Code.

But, even if it be true from the testimony on behalf of respondent, that the decedent maintained an establishment at the places where the mother and the child lived which had something of the character of a family in the sense in which that term is used in some of the decisions, although clandestine with respect to his legitimate family, it cannot be denied, on the other hand, that he did not treat the child as if it were a legitimate child. A father of a legiti-

mate child, under such circumstances, does not ·cause or allow it to be known by an assumed name. If he wanted the child to be deemed legitimate, he would have it known by his own name, he would naturally refer to it when associating with his own mother, sister, and brothers, and he would either take the child to see them or have them see the child. If he had been estranged from his own family he might not have done so, but that was not the case. When his relatives were in San Francisco he was associating with them as a member of the family during all of the time, yet he never in any sense treated the child as he would a legitimate child so far as they were concerned. It is a circumstance proper to be considered in determining this question that when the decedent discussed his will with I. I. Brown, whom he named as his executor, some time after the birth of petitioner, he made no change therein.

[4] Where the father of an illegitimate child has members of his own family living in the same community, with whom he is in almost constant association and maintains cordial relations, he does not treat the child as if it was a legitimate child, if he conceals its existence from such members of his real family, never has them visit the child or has the child visit them, or in any other manner acts toward the child with regard to his own legitimate relatives as any father reasonably would do if he intended to adopt the child as his own and treat it as his legitimate child. Such treatment is contrary to the sense in which section 230 of the Civil Code uses the phrase "otherwise treating it as if it were a legitimate child." The treating it as if it were legitimate is as essential to a legal adoption under that section as any of the other elements therein mentioned. Because of the want of such treatment we are of the opinion that there was no adoption.

Having reached this conclusion it will serve no purpose to consider the numerous specifications of error in the rulings and in the instructions.

Judgment and decree reversed.

Shaw, J., and Olney, J., concurred.

Hearing in Bank denied.

All the Justices concurred, except Kerrigan, J., *pro tem.*, who did not act.